**Valorie BURKS, et al.**

v.

**The CITY OF PHILADELPHIA and Richard Scott.**

Civil Action No. 95–1636.

United States District Court, E.D. Pennsylvania.

Dec. 30, 1996.

As Amended Jan. 31, 1997.

Clifford A. Boardman, Philadelphia, PA, for Plaintiffs.

Raymond A. Kresge, Jessamyne M. Simon, Pepper, Hamilton and Scheetz; and E. Jane Hix, Asst. City Solicitor, Philadelphia, PA, for Defendants.

Raymond A. Kresge, Pepper, Hamilton and Scheetz, Philadelphia, PA, for Respondent.

## MEMORANDUM AND ORDER

BECHTLE, District Judge.

Presently before the court are motions for summary judgment filed by the City of Philadelphia ("City") and Richard Scott ("Scott") (jointly, "Defendants"), and the opposition thereto of Valorie Burks ("Burks"), Veronica Hodges ("Hodges"), Marcella B. Mills ("Mills"), James Roberts ("Roberts"), Linda Robb ("Robb"), Noelle E. Sewell ("Sewell"), Terence Young ("Young"), and David L. Valentine ("Valentine") (collectively, "Plaintiffs"). One motion seeks summary judgment on Plaintiffs' Title VI claim and any claim for punitive damages against the City or Scott in his official capacity. The other seeks summary judgment on the ground that six of the eight Plaintiffs cannot prevail on their employment discrimination claims and that their claims for compensatory damages should be stricken. For the reasons set forth below, the motion on the Title VI and punitive damages claims will be granted in its entirety, and the motion addressing the merits of Plaintiffs' cases and the compensatory damages issue will be granted in part and denied in part.

## I. BACKGROUND

This civil action involves the alleged racially discriminatory employment practices of Scott, who served as director of the City's AIDS Activities Coordinating Office ("AACO") between February 1993 and July 1995. Plaintiffs are African–Americans who worked at AACO under Scott or were denied AACO jobs for which they applied during Scott's tenure. They have alleged claims under 42 U.S.C. §§ 1981, 1983, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq.[1]

Plaintiffs commenced this civil action on March 21, 1995. For the purposes of deciding these motions, the court need not describe all the facts pertaining to the allegations in the case. In a nutshell, the Amended Complaint alleges that Scott, who is white, engaged in a pattern and practice of intentionally discriminating against African–Americans. (Am.Compl. ¶ 10.) Plaintiffs allege that Scott intended to prevent African–Americans from advancing to senior-level positions at AACO. Id. ¶ 11. Scott accomplished this, Plaintiffs contend, by diluting African–American employees' power and influence at the agency, rejecting African–American–led initiatives and projects, and steering funds from African–American–based AIDS community groups to their white-based counterparts. See id. ¶ 12. The Amended Complaint also avers that Defendants' reorganizations of AACO served to eliminate African–American influence in the agency's decisions. Id. ¶ 13. Plaintiffs seek declaratory, injunctive, and monetary relief. Id. at 8.

Defendants denied these allegations and have filed four summary judgment motions. On May 31, 1996, they filed a Motion for Summary Judgment on Plaintiffs' Title VI Claim and Claims for Punitive Damages. On June 11, 1996, they filed a Motion for Summary Judgment on All or Part of the Claims of Plaintiffs Mills, Hodges, Valentine, Sewell, Burks and Young and to Strike the Claims of all Plaintiffs for Compensatory Damages. On August 14, 1996, Defendants filed a Motion for Summary Judgment Based on Lack of Policy or Custom. On December 19, 1996, they filed a motion for Summary Judgment on All Plaintiffs' Claims. The court has re-

---

1. This court has subject-matter jurisdiction over the claims in this civil action because they arise under the federal civil rights laws. 28 U.S.C. §§ 1331, 1343. Venue is proper because a substantial part of the events giving rise to the claims occurred in this judicial district. 28 U.S.C. § 1391(b)(2).

ceived Plaintiffs' responses to the first three motions.

For the reasons set forth below, the court will grant Defendants' motion on the Title VI and punitive damages claims. The court will grant in part and deny in part the motion challenging the merits of six Plaintiffs' claims and the claims for compensatory damages. The court will defer ruling on the other two summary judgment motions.

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT MOTIONS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Fed.R.Civ.P.* 56(c). Whether a genuine issue of material fact is presented will be determined by asking if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the non-moving party has the burden to produce evidence to establish prima facie each element of its claim. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Such evidence and all justifiable inferences that can be drawn from it are to be taken as true. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14. However, if the non-moving party fails to establish an essential element of its claim, the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## III. MOTION REGARDING THE TITLE VI CLAIM

Count III of the Amended Complaint seeks recovery under Title VI. (Am.Compl. ¶¶ 23–24.) Of the eight Plaintiffs, only Robb and Roberts, as former AACO managers, seek relief under this statute.[2] They allege that Defendants subjected them to racially discriminatory employment practices at AACO, causing the intended beneficiaries of federal funds—community groups and other persons and entities combating AIDS—to be adversely affected on the basis of race. *Id.* ¶ 24. Specifically, Robb and Roberts argue that Defendants harmed these beneficiaries by halting and refusing to fund certain programs and failing to fill vacancies in AACO's prison unit, which serves a predominantly minority clientele. (Pls.' Mem.Opp.Summ.J. at 12.)

■ Title VI embodies a contract-like arrangement between Congress and entities that receive money from its appropriations: "[T]he recipient's acceptance of the funds triggers coverage under the nondiscrimination provision." *United States Dep't of Transp. v. Paralyzed Veterans of Am.,* 477 U.S. 597, 605, 106 S.Ct. 2705, 2711, 91 L.Ed.2d 494 (1986). The nondiscrimination provision of Title VI is Section 601, which provides that "[n]o person in the United States shall, on the ground of race ... be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. The United States Supreme Court has recognized that private persons have an implied right of action for monetary damages under Title VI. *Consolidated Rail Corp. v. Darrone,* 465 U.S. 624, 630 & n. 9, 104 S.Ct. 1248, 1252 & n. 9, 79 L.Ed.2d 568 (1984) (stating that a majority of the Court, in *Guardians Ass'n v. Civil Service Commission of New York,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983), "agreed that retroactive relief is available to private plaintiffs for all discrimination, whether intentional or unintentional, that is actionable under Title VI"); *see also Franklin v. Gwinnett County Pub. Schs.,* 503 U.S. 60, 70, 112 S.Ct. 1028, 1035, 117 L.Ed.2d 208 (1992).

■ The first issue is whether the alleged racial discrimination occurred "under a program or activity receiving federal financial

---

**2.** Plaintiffs' counsel informed the court of this fact at oral argument. The Amended Complaint, however, reads as if all eight Plaintiffs are alleging Title VI claims. The court, therefore, will treat Plaintiffs' counsel's statement as a concession that Defendant is entitled to summary judgment on the Title VI claim as to all Plaintiffs except for Robb and Roberts.

assistance." The parties agree that AACO, a division of the City's Health Department, receives federal funds in the area of HIV and AIDS from two sources: The Health Omnibus Programs Extension of 1988, Pub.L. No. 100–607, tit. II, 102 Stat. 3093 (codified as amended at 42 U.S.C. § 300ee *et seq.*) ("CDC funds"), and the Ryan White Comprehensive AIDS Resources Emergency Act of 1990, Pub.L. No. 101–381, 104 Stat. 576 (codified as amended at 42 U.S.C. § 300ff *et seq.*) ("Ryan White funds") (*See* Defs.' Mem.Supp. Summ.J. Exs. A, B; Valentine Dep. at 346.) The City uses this money to fund AACO's operations, which, in turn, provide HIV and AIDS education, training, testing, and other health-related services to the Philadelphia community. AACO's operations qualify as a "program or activity" because such operations are "of a department, agency ... or other instrumentality ... of a local government." [3] 42 U.S.C. § 2000d–4a(1)(A).

 Because Robb and Roberts have alleged that Defendants subjected them to racially discriminatory employment practices, Section 604 of Title VI applies. This section provides that "[n]othing contained in this subchapter shall be construed to authorize action under this subchapter ... with respect to any employment practice of any employer ... except where a primary objective of the Federal financial assistance is to provide employment." 42 U.S.C. § 2000d–3. Thus, discriminatory employment practices can give rise to Title VI liability only when a primary objective of the federal money that Congress extends to the program or activity is to provide employment. Robb and Roberts do not contend that a primary purpose of the Ryan

White or CDC funds is to provide employment.[4] Therefore, they cannot state a claim under 42 U.S.C. § 2000d–3.

Robb and Roberts base their claim entirely on a regulation promulgated by the Department of Health and Human Services to effectuate Title VI. *See* 42 U.S.C. § 2000d–1; 45 C.F.R. § 80.3. The regulation states:

> Where a primary objective of the Federal financial assistance is not to provide employment, but discrimination on the ground of race ... in the employment practices of the recipient ... tends, on the ground of race ... to exclude individuals from participation in, to deny them the benefits of, or to subject them to discrimination under any program to which this regulation applies, the foregoing provisions of this paragraph (c) shall apply to the employment practices of the recipient ... to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries.

45 C.F.R. § 80.3(c)(3). The court finds that Robb and Roberts, as a matter of law, cannot prevail on a claim based on this regulation for two reasons. First, the regulation is invalid because it is inconsistent with the plain language of the statute. Second, Robb and Roberts have not presented evidence to support a finding that Defendants subjected them to a discriminatory employment practice that caused discriminatory treatment of the beneficiaries of the relevant federal financial assistance.

**1. Conflict Between the Regulation and the Statute**

 Defendants argue that 45 C.F.R. § 80.3(c)(3) is inconsistent with 42 U.S.C.

---

**3.** The parties have debated whether the City is a "program or activity" under §§ 2000d and 2000d–4a. This inquiry is irrelevant because § 2000d–4a does not define which parties are proper defendants in a Title VI action. Rather, the section "merely lists those programs that are subject to the restrictions imposed by Title VI." *Buchanan v. City of Bolivar*, 99 F.3d 1352, 1356 (6th Cir.1996). The only pertinent issue, therefore, is whether a person was subjected to discrimination *"under"* a program or activity receiving federal money. If the court makes such a finding, Robb and Roberts may seek to hold liable the parties that are legally responsible for the discrimination.

**4.** Indeed, Ryan White funds are intended "to provide for the establishment of education and information programs to prevent and reduce exposure to, and the transmission of, the etiologic agent for [AIDS]." 42 U.S.C. § 300ee(a).

CDC funds are intended to provide emergency assistance to localities that are disproportionately affected by the [HIV] epidemic and to make financial assistance available to States and other public or private nonprofit entities to provide for the development, organization, coordination and operation of more effective and cost efficient systems for the delivery of essential services to individuals and families with HIV disease.

42 U.S.C. § 300ff.

§ 2000d–3. (Defs.' Reply Mem.Supp. Summ.J. at 8.) The court agrees. Section 2000d–3 permits actions against discriminatory employment practices *only* when a primary purpose of the federal funding is to provide employment. As the following analysis demonstrates, Section 80.3(c)(3) does the same even when a primary purpose of the funding is something other than providing employment.

Section 80.3(c)(3) applies when a primary objective of the relevant Federal funds is not to provide employment but racial discrimination in the employment practices of the federally funded program tends to deny individuals the benefits of a program. If these elements have been satisfied, the "foregoing provisions of this paragraph (c)" apply to the employment practices of the entity receiving the federal money, but only "to the extent necessary to assure equality of opportunity to, and nondiscriminatory treatment of, beneficiaries." This incorporates Section 80.3(c)(1), which states that, when a primary objective of the Federal financial assistance is to provide employment, the recipient of federal financial assistance may not subject an individual to racial discrimination in its employment practices.

Therefore, even though Section 80.3(c)(3) appears to be limited to discrimination in the employment practices under a program or activity that receives federal financial assistance whose primary purpose *is not* to provide employment, the regulation actually incorporates Section 80.3(c)(3)'s nondiscrimination provisions, which apply to programs or activities that receive assistance whose primary objective *is* to provide employment.

Applying the nondiscrimination prohibition to programs or activities that receive federal financial assistance that are not intended primarily to provide employment is inconsistent with 42 U.S.C. § 2000d–3 because the statute prohibits discriminatory employment practices only when the primary purpose of the federal financial assistance is to provide employment. Given this irreconcilable conflict, the statute must prevail over the regulation.

*Fowler v. United States Parole Comm'n,* 94 F.3d 835, 841 (3d Cir.1996).

Robb and Roberts, therefore, may challenge Defendants' employment practices only under 42 U.S.C. § 2000d–3 and any regulation consistent with that statute. Because they do not argue that a primary purpose of the federal financial assistance is a purpose other than providing employment, Robb and Roberts cannot state a Title VI claim challenging an employer's employment practices under the facts that they have presented.

### 2. Whether Robb & Roberts Alleged an "Employment Practice"

Even if 45 C.F.R. § 80.3(c)(3) provides Robb and Roberts with a cause of action, their claim cannot succeed because they have not shown racial discrimination in Defendants' "employment practices," as required by the regulation.

██ Neither Title VI nor its accompanying regulations define "employment practice." The United States Court of Appeals for the Third Circuit, however, has stated in a slightly different context that the term "must relate to an employment relationship." *Nelson v. Upsala College,* 51 F.3d 383, 388 (3d Cir.1995) (Title VII retaliation case). The court interprets this statement as meaning that the practice in question must relate to an employee's discharge, discipline, layoff, promotion, demotion or downgrading of position, denial of tenure, transfer, retaliation, denial of training, compensation, or other similar feature of the employment relationship. *See* 1 Lex K. Larson, *Employment Discrimination* § 8.08, at 8–114 to –117 (2d ed. 1996) (listing the types of practices to which the Supreme Court's rules of proof in employment discrimination cases have been applied). The term "employment practice" does not encompass conduct in general that an employee finds objectionable. *See Nelson,* 51 F.3d at 388.

Robb and Roberts allege that Scott engaged in three categories of discriminatory conduct. The first category relates to Scott's rejection of programs that would have benefitted minority groups.[5] The second catego-

---

**5.** Robb and Roberts allege that Scott rejected the hiring of a minority community group to trans-

ry includes Scott's halting of programs that benefitted the minority community.[6] The third category involves Scott's failure to fill vacancies in AACO's prison unit.[7]

■ The court has carefully reviewed the admissible evidence that Robb and Roberts have submitted to the court in support of their motion.[8] The court finds that almost all of their complaints involve decisions made by Scott concerning AACO's priorities. Robb and Roberts find these decisions objectionable because they believe that they were motivated by Scott's dislike and disrespect for African–Americans and other minorities. There is some evidence supporting this allegation. (*See* Robb Dep. at 144–49). Scott's decision to reject an initiative or deny funding for a program, however, does not qualify as an "employment practice" because such decisions do not affect an employee's employment relationship with his or her employer.

Further, Robb and Roberts do not allege that Scott's decisions were motivated by a race-based animus toward them. The evidence shows that if Scott was discriminating against anybody on the ground of race, it was the African–American community groups that would have benefitted from the funding that he denied them. Robb and Roberts' theory is that Scott did not have sympathy for minority groups or minority persons suffering with HIV or AIDS. Assuming this to be true, the discrimination in these funding decisions was totally unrelated to Scott's relationship with Robb and Roberts as AACO employees.

■ Roberts describes one decision that involves an employment practice: Scott's transfer of Roberts' duties and staff members to Kevin F. Green ("Green"), a white supervisor. Roberts, however, does not argue that the mere transfer was discriminatory. He asserts that transferring him *without first consulting with him and obtaining his consent* was discriminatory because Scott had always consulted and obtained the consent of white managers before he transferred

---

late AIDS information for Asian–American inmates at the Philadelphia prisons, (Roberts Dep. 5/18/96 at 23–27); a community-based AIDS education initiative that would have benefitted mostly minority groups, (Roberts Dep. 5/13/95 at 246–50); and a recommendation to increase funding for WPEB, a West Philadelphia-based radio station that broadcasts AIDS-related programming to a predominately African–American audience, (Robb Dep. at 144–49).

6. This allegation stems from Roberts' complaint that Scott, without first consulting Roberts or obtaining his consent, transferred responsibility for training individuals to perform AIDS testing from Roberts to a white director. (Roberts Dep. 5/13/96 at 188.) Roberts alleges the following facts.

The transfer was discriminatory because Scott never had taken the job duties away from a white manager without prior consultation and agreement. (Roberts Aff. ¶ 2.) The transfer slowed the progress of AIDS testing in Philadelphia. (Roberts Dep. 5/13/96 at 193.) This was so because the City requires all AIDS counselors and testers to be trained by the City. *Id.* Without training, there would be fewer counselors for the minority AIDS organizations, which need the highest level of accurate science-based information because they did the most to provide AIDS education to the community. *Id.* at 193, 248–49. With fewer counselors, fewer minority persons with AIDS would be identified, which, in turn, would reduce funding to the minority community to combat AIDS. *Id.* at 193. The number of

training sessions decreased from an average of one training session a month to one every two or three months. *Id.* at 194.

7. Roberts alleges that this decision was racially discriminatory because AACO's prison unit serves an overwhelmingly minority clientele. (Roberts Dep. 5/18/96 at 130.) In addition, he alleges, white managers never had difficulty filling vacancies at the prisons. (Roberts Aff. ¶ 3.)

8. In their brief, Robb and Roberts state that they were unable to make a complete factual argument because Scott's deposition was not finished. (Pls.' Mem.Opp.Summ.J. at 11 n. 9.) They stated that they would file a supplemental response on July 8, 1996. *Id.* The docket reveals that no such supplement was filed. Rather, in Plaintiffs' memorandum in opposition to a separate summary judgment motion, they declare that "[t]his Facts section and incorporated references also amends" their response on the Title VI motion. This bald declaration is insufficient to amend the response on the Title VI motion. It is also unacceptable because it requires the court read, analyze, classify, and select the facts that Robb and Roberts hope will be relevant to the legal principles in the earlier motion through the later motion (which contains at least 300 pages of deposition testimony), and apply those facts. The initial application of law to the relevant facts is counsel's job. The court, therefore, will not consider Scott's deposition, or other "incorporated references" in adjudicating the Title VI motion.

their duties. (Roberts Aff. ¶¶ 2–3.) The record does not support this argument because there is no evidence that Scott ever transferred a white manager's duties. Further, Roberts does not allege that Scott had a duty to consult with him or that Scott had no authority to transfer his duties. Therefore, Scott's decision to shift duties and staff members without first notifying Roberts may have been disrespectful to him, but it does not rise to the level of a discriminatory employment practice in the Title VI context.[9]

### 3. Summary

■ The main point of Robb and Roberts' deposition testimony is that Scott made several decisions at AACO that derive from his racist attitude toward African–Americans, and that those decisions caused various minority AIDS community groups to receive less funding and training, which caused AIDS sufferers in the minority community to receive less testing and other services. This claim may be cognizable under Title VI, but not in the employment context. The proper parties for such a claim may be the adversely affected community groups or a class of persons who have been harmed by the shifts in funding for which Scott was responsible. Title VI simply does not contemplate the type of claim that Robb and Roberts allege in this case. The court finds that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law on Count III of the Amended Complaint. For these reasons, the court will grant Defendants' motion.[10]

### IV. *MOTION REGARDING THE MERITS OF CERTAIN PLAINTIFFS' CLAIMS*

#### 1. Introduction

Defendants argue that they are entitled to summary judgment because Burks, Hodges, Mills, Sewell, Valentine, and Young cannot prevail on their employment discrimination

claims and that all Plaintiffs' claims for compensatory damages should be stricken because they have neither produced their medical records nor executed authorizations for the release of their medical records. Plaintiffs respond that the court must deny the motion with regard to the six Plaintiffs' claims because there are genuine issues of material fact. They also state that they have complied with the relevant court orders concerning the production of medical records and authorizations for the release of medical records.

#### 2. The Framework for Adjudicating Plaintiffs' Employment Discrimination Claims

■ The United States Supreme Court has recognized two approaches to adjudicating employment discrimination cases, depending on whether the plaintiff has direct evidence of discrimination. If there is no direct evidence, the court must apply the burden-shifting process set forth in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). When the plaintiff offers direct evidence of discrimination, the *McDonnell Douglas* approach does not apply and the case proceeds as an ordinary civil suit. *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985); *Torre v. Casio, Inc.,* 42 F.3d 825, 829 n. 3 (3d Cir.1994).

■ Plaintiffs argue that they have submitted direct evidence of discrimination. To satisfy this burden, they must prove that there is evidence to prove the existence of the discrimination *"without inference or presumption." Torre,* 42 F.3d at 829 (quotation omitted). This burden is not satisfied when the trier of fact must infer the unlawful discrimination from an employer's remarks. *Id.*

In the present case, the court must examine the evidence to determine whether it directly proves the existence of employment

---

9. Even if the dilution of Roberts' responsibilities was improper and racially motivated, the connection between the transfer of his duties and the harm to the ultimate beneficiaries of the CDC funds—persons suffering with AIDS—is far too attenuated to support Title VI liability.

10. Plaintiffs concede that they have no claim for punitive damages against the City or Scott in his official capacity. (Pls.' Mem.Opp.Summ.J. at 1.)

discrimination. Plaintiffs offer the deposition testimony of David R. Fair ("Fair"), a former City Health Department official who has known Scott for eleven years. (Fair Dep. 5/6/96 at 284–85.) He testified that he has spoken many times with Scott publicly and privately about AIDS issues when Scott was at AACO and before then, when Scott was an activist involved in HIV and AIDS causes in Philadelphia. Fair testified that he has never heard Scott personally call somebody a name, but he believes that Scott generally has not been careful about making disparaging comments "that have a racial tinge to them." *Id.* at 69. Fair also testified that Scott disrespects African–Americans and Latinos because he believes they are not as smart as white people, *id.* at 284, and that he treats African–Americans as if they were Amos and Andy, (Fair Dep. 5/22/96 at 413–14).

Fair had spoken to Scott about AIDS-related issues while Scott was the AACO director. Fair testified that whenever Scott could blame an AACO-related problem on an African–American, he would do so. *Id.* at 69–70. According to Fair, Scott views his nonwhite employees as buffoons and does not respect them as competent people. (Fair Dep. 5/22/96 at 414.) Fair said that Scott would talk about how to get rid of African–American AACO staff members so he could get people who knew what they were doing. (Fair Dep. 5/6/96 at 285.) In particular, Scott talked to Fair about getting Robb away from responsible positions. *Id.* at 286.

Fair also knows Scott from various community group administrative meetings. *Id.* at 298. In this context, Fair testified, Scott frequently said that all minority-led organizations are not smart enough to handle certain work. *Id.* at 317–19. Whenever race was an issue at such meetings, Fair stated, Scott would make a comment that was at least perceived of as pejorative or condescending. *Id.* at 298.

Robb testified that Scott has referred to the Minority AIDS Coalition as "those people who are incompetent." (Robb Dep. at 144). Robb heard Scott say that the owner of a West Philadelphia radio station that broadcasts AIDS information to the minority community was "trying to work voodoo on him." *Id.* at 145. Robb also heard Scott say that Burks and another African–American AACO staff member "were incompetent and did not know how to write." *Id.* In a separate episode, Roberts testified, Scott called an African–American "a stupid, stupid man." (Roberts Dep. at 148.) [11]

The above evidence describes Scott's attitude in general toward African–Americans and others of minority races. It is, however, *circumstantial* evidence that Scott discriminated against Plaintiffs in the terms and conditions of their employment relationship. It is not direct evidence of employment discrimination. *See Thurston,* 469 U.S. at 121, 105 S.Ct. at 621–22 (finding that there was direct evidence of discrimination because the defendant had adopted a transfer policy that was "discriminatory on its face"). Thus, Plaintiffs may use Scott's remarks to argue that a jury may *infer* that race was a motivating factor in Scott's employment decisions concerning Plaintiffs. The court finds that this is not a "direct evidence" case and will apply the burden-shifting *McDonnell Douglas* framework to all the employment discrimination claims in this civil action.[12]

Under *McDonnell Douglas,* the plaintiff bears the initial burden of stating a prima facie case of racial discrimination. A prima facie case setting forth an employer's failure to hire or promote on the basis of race discrimination comprises four elements:

---

**11.** Plaintiffs submit evidence that Scott looked down on persons from Puerto Rico. Fair testified that, at a 1994 senior staff meeting, Scott said: "Don't any Puerto Ricans go to college?" (Roberts Dep. at 125.) Roberts testified that, at an HIV Community Planning Group meeting in August 1994, Scott said: "I don't want all the Puerto Ricans sitting in one place." *Id.* at 141–42.

**12.** Plaintiffs' legal memorandum is off the mark on this issue. All the federal appellate cases they cite, (Pls.' Mem.Opp.Summ.J. at 9–10.), are inapposite because they are not "direct evidence" cases. Rather, they generally are affirmances of jury verdicts that had been challenged on the ground that they could not be sustained under the evidence presented at trial.

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824 (footnote omitted). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.*

■■■■ If the defendant carries its burden and introduces into evidence a legitimate reason for its actions, the prima facie case is rebutted and the burden of production returns to the plaintiff, who then must prove by a preponderance of the evidence that the employer's explanation is a pretext for discrimination. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 255–56, 101 S.Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1981). A plaintiff proves that the explanation is a pretext if he or she shows *"both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 515, 113 S.Ct. 2742, 2752, 125 L.Ed.2d 407 (1993). The Court has emphasized that the plaintiff, at all times, has the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.[13]

■■■■ The Third Circuit has applied the *McDonnell Douglas* framework to the context of a motion for summary judgment. It has held that a plaintiff who has made a prima facie case may defeat a summary judgment motion either by pointing to some evidence from which a factfinder could either (1) disbelieve the defendant's proffered reasons or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the adverse employment action. *Fuentes v. Perskie,* 32 F.3d

759, 764 (3d Cir.1994). These showings may be made by direct or circumstantial evidence. *Id.* Thus, if the plaintiff has offered evidence to discredit the defendant's proffered reasons, it need not advance additional evidence of discrimination beyond his or her prima facie case to defeat a summary judgment motion. *Id.* More specifically,

> to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).

> To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent. Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them "unworthy of credence," and hence infer "that the employer did not act for [the asserted] nondiscriminatory reasons."

*Id.* at 764–65 (citations and footnote omitted).

### 3. Whether Defendants Are Entitled to Summary Judgment on Certain Claims

Defendants' motion requests summary judgment on (1) Hodges' claim that she should have been given the temporary appointment as Public Health Program Analysis Supervisor (Counseling and Testing) ("C & T Supervisor"), on the ground that she did not apply for the job; (2) Hodges' claim that Scott attempted to transfer her to AACO's prison unit, on the ground that she suffered

---

**13.** The *McDonnell Douglas* framework applies to claims alleging racial discrimination under 42 U.S.C. § 1981, *Patterson v. McLean Credit Union,* 491 U.S. 164, 186, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989), and 42 U.S.C. § 1983, *Hicks,* 509 U.S. at 506 n. 1, 113 S.Ct. at 2746 n. 1 (1993); *McKenna v. Pacific Rail Serv.,* 32 F.3d 820, 825 n. 3 (3d Cir.1994).

no adverse employment action; (3) Mills' claim concerning the C & T Supervisor job, on the ground that she admits that she was not the best qualified candidate; (4) Sewell's claim concerning the temporary C & T Supervisor job, on the ground that she was not qualified; (5) Valentine's claim regarding the Public Health Program Analyst ("Analyst") job, on the ground that he was not qualified; and (6) Young and Burks' claims regarding the Public Health Program Analyst Supervisor—AIDS Services ("AIDS Services Supervisor") position, on the ground that they admit that the selection was not based on race. (Defs.' Mem.Supp.Summ.J. at 2–3.)

After Defendants filed their motion, Hodges withdrew her claim that she was entitled to temporary appointment to the C & T Supervisor job, and Plaintiffs' counsel informed the court that Young and Burks do not challenge their failure to obtain the AIDS Services Supervisor position.

### a. Hodges' Attempted Transfer to the Prison Unit

Scott attempted to transfer Hodges from a job as Health Social Work Supervisor at Health Center No. 1 to a job in the prison office. (Scott Dep. at 354; Hodges Aff. ¶ 4.) Hodges did not want to work in the prison because she considered the transfer a demotion.[14] (Hodges Aff. ¶ 4–5.) Nevertheless, Scott continued to try to transfer her. (Scott Dep. at 354.) Hodges had to ask a Philadelphia City Council member to intercede on her behalf to block the transfer. (Hodges Aff. ¶ 7.) Hodges never was transferred to the prison. (Hodges Dep. 4/30/96 at 58.) Hodges knows of no other AACO worker who was ordered to be summarily transferred to the prison and demoted in his or her responsibilities. (Hodges Aff. ¶ 4.) Except for Valentine, Hodges was the only AACO employee who did not have the "privilege of being free from the risk of involuntary transfer and demotion." Id. ¶ 6. Hodges also asserts that she is the only AACO employee who has had to contact an immedi-

ate supervisor and a City Council member to keep his or her job. Id. ¶ 7.

Plaintiffs have not provided, and the court has not found, legal authority supporting the notions that (1) an employee can maintain an employment discrimination claim on the basis of an "attempted transfer" or that (2) the terms and conditions of an employee's employment have been adversely modified when she feels that she is not free from the risk of involuntary transfer and demotion. Hodges' claim must fail as a matter of law. The parties agree that Scott tried to transfer Hodges to AACO's prison unit. They also agree that this did not happen and that Hodges' employment relationship with the City never changed. Scott's attempted transfer may have given Hodges the belief that her present position was not secure. But the belief that one is under a risk of involuntary transfer or demotion is not a "term or condition of employment" because it does not affect one's employment relationship with the employer. Hodges' complaints simply cannot give rise to an employment discrimination claim under 42 U.S.C. §§ 1981 and 1983. The court will grant Defendants' motion on this ground.

### b. Supervisor of Counseling and Testing

In a December 9, 1993, memorandum to AACO Staff, Scott announced the approval of a new AACO job—the C & T Supervisor position—to oversee the City's AIDS counseling and testing programs. (Pls.' Mem. Opp.Summ.J.Ex.C.) Rather than wait until the civil service testing process was complete, Scott said he wanted to assign someone to the job temporarily to fill it as soon as possible. Id. Persons meeting the job requirements were invited to submit a resume by December 14, 1993. Id. Scott's memorandum was accompanied by four pages setting forth the qualifications for the position. Id.

---

**14.** Scott testified that the transfer would not be a demotion. He said that he intended that Hodges supervise social workers at the prison because those workers were not keeping up with their counseling and testing appointments and were concerned about their ability to serve the women in the prison. (Scott Dep. 7/1/96 at 353–54.) Scott had no other employee to fill that role, and he believed that Hodges had the right skills and that her job could easily be filled. Id. at 354–55.

Green was rated first after an oral examination. (Hodges Dep. 5/17/96 at 52.) However, the results were canceled by City personnel officials after some of the candidates complained that one of the interviewers, a member of Scott's management team, would not rate them objectively. (*See id.* at 49; Burks Dep. at 147–49.) The City scheduled a second test in 1995. (Hodges Dep. at 49.) After the second test, Green was rated first, followed by Mills, Burks, and Hodges. *Id.* at 52. Green was given the job. About nine months later, the City advertised the permanent C & T Supervisor job, and Green was selected.

### i. Mills

Defendants argue that even if Mills establishes that Defendants are liable to her for their refusal to hire her as temporary C & T Supervisor, she cannot recover back pay and a retroactive promotion because she admitted that she thought Hodges was the best qualified person for the temporary C & T Supervisor job.[15] (Mills Dep. at 174.) In the analogous Title VII context, federal appellate courts have followed the rule that an employee should be denied damages if her qualifications relative to another candidate were such that he or she would not have received the position. *Caviale v. State of Wis., Dep't of Health and Social Servs.,* 744 F.2d 1289, 1295–96 (7th Cir.1984); *Patterson v. Greenwood Sch. Dist. 50,* 696 F.2d 293, 295 (4th Cir.1982).

■ In this case, Mills testified that she was qualified for the position and that, based on what she knew about the other candidates, Hodges was the best qualified. She also testified about a scenario in which she could have been one of the top two finalists

after the examination, received an interview, and won the job over a more qualified candidate because of qualities other than experience. (Mills Dep. at 179.) She emphasized that the raters and interviewers assess who is best qualified. *Id.* at 181. Therefore, Mills' admission that she believed Hodges was the best qualified candidate is not an admission that she would not have received the position in the event that Green was not selected. For this reason, the cases cited by Defendants do not apply and Defendants are not entitled to summary judgment on this ground.

### ii. Sewell

Defendants assert that Sewell cannot establish the second element of her prima facie case of employment discrimination, *i.e.,* that she was qualified for the temporary C & T Supervisor assignment because Scott's memorandum advertising the position was addressed to "AACO Staff," (Pls.' Mem. Opp.Summ.J.Ex.C), and Sewell was not an AACO staff member when the job was posted, (Sewell Dep. at 149).

■ The evidence submitted by Plaintiffs reveals that the four-page job specification for the temporary position does not state that *only* AACO staff members were eligible to apply. (Pls.' Mem.Opp.Summ.J.Ex.C.) The advertisement announcing the civil service examination for the permanent C & T Supervisor job states that it was open to all City Health Department workers, not just AACO staff. *Id.* Ex. E. Similarly, a City personnel official told Sewell that the position was open to all Health Department employees and that Sewell was eligible for the job because she worked in the Disease Control unit. (Sewell Aff. ¶ 2.) In addition,

---

**15.** After Defendants filed the instant motion, Mills retreated from her statement and declared in a sworn affidavit that she "certainly did not admit that Ms. Hodges was the best qualified for the job." (Mills Aff. ¶ 4.) The court finds that the deposition and the affidavit contradict each other. When a nonmovant's affidavit contradicts earlier deposition testimony and fails to provide a satisfactory explanation for the conflict, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists. *Hackman v. Valley Fair,* 932 F.2d 239, 241 (3d Cir.1991); *Martin v. Merrell Dow*

*Pharmaceuticals, Inc.,* 851 F.2d 703, 706 (3d Cir.1988); *Penchishen v. Stroh Brewery Co.,* 932 F.Supp. 671, 676 (E.D.Pa.1996). Mills does not explain the inconsistency. Rather, she clarifies her position by emphasizing that the interviewer, and not she, determines who is best qualified for the position. (Mills Aff. ¶ 4.) This statement, however, cannot affect her testimony that she believed Hodges was more qualified than her. Therefore, the court will disregard Mills' affidavit to the extent that it contradicts her deposition testimony.

during the interview for the job, Scott said that Sewell was "overqualified." (Sewell Dep. at 109–10.) Based on this evidence, a jury could reasonably conclude that Sewell met all the qualifications for the job even though she was not an AACO employee. Because there is a genuine issue of material fact, the court will deny Defendants' motion for summary judgment on this ground.

### c. Valentine's Qualifications for the Analyst Job

Defendants argue that Valentine failed to establish a prima facie case for employment discrimination because he was not qualified for the Analyst position, which was given to a white man. Defendants contend that Valentine's deposition testimony reveals that he did not meet a mandatory qualification for the job: one year of experience performing either counseling, health, teaching or patient care in an AIDS service delivery program in a paid or volunteer capacity. (Valentine Dep. 4/24/96 at 156.) Valentine asserts that he satisfied this requirement because he engaged in teaching while working at Congreso de Latinos Unidos, Inc. ("Congreso"), a Latino-based AIDS community group in Philadelphia.

The evidence reveals that at Congreso, Valentine assisted AIDS educators with their presentation skills. (Valentine Dep. 4/24/96 at 101–03.) He edited text and arranged for illustrations in brochures that the educators would use. *Id.* at 106–08. He devoted about ten percent of his time answering questions from AIDS educators. *Id.* at 105. He also worked on more than twenty-five news stories and news releases concerning activities in which Congreso's AIDS educators were involved. *Id.* at 111–12.

The court, viewing the evidence in the light most favorable to Valentine, finds that a reasonable jury could conclude that Valentine's experience at Congreso qualifies under the broad, vague umbrella of "teaching." Therefore, because there is a genuine issue of material fact, the court must deny Defendants' motion on this ground.

### 4. Plaintiffs' Claims for Compensatory Damages

Defendants ask the court to strike Plaintiffs' claims for compensatory damages because Plaintiffs have failed to produce medical records and execute authorizations for the release of medical records. (Defs.' Mem. Supp.Summ.J. at 12–15.) At a hearing on December 5, 1996, the court ordered Plaintiffs to deliver such documents to Defendants by December 12, 1996. The court also ordered that Plaintiffs who fail to deliver the authorizations on time will have their claims dismissed with prejudice.

Plaintiffs delivered the authorizations to Defendant on time. However, the documents contained an advisory "that, consistent with the Pennsylvania Confidentiality of HIV–Related Information Act, this authorization *does not authorize you to release any information related to my HIV status or medical treatment.*" Defendants objected to this restriction, and the parties were unable to reach an agreement. At a hearing on December 23, 1996, the court ordered Plaintiffs to produce authorizations with no such limitations.

At the hearing, the court learned that Plaintiffs had not designated an expert to give an opinion on the issue of whether the alleged employment discrimination caused Plaintiffs to suffer emotional pain and suffering. The court directed Defendants to file a motion on this issue. For this reason, the court will, at this time, deny without prejudice the portion of Defendants' summary judgment motion asking the court to strike Plaintiffs' claim for compensatory damages.

## V. CONCLUSION

For the reasons set forth above, the court will grant Defendants' Motion for Summary Judgment on Plaintiffs' Title VI Claim and Claims for Punitive Damages. The court will grant in part and deny in part Defendants' Motion for Summary Judgment on All or Part of the Claims of Plaintiffs Mills, Hodges, Valentine, Sewell, Burks, and Young and to Strike the Claims of All Plaintiffs for Compensatory Damages.

An appropriate Order follows.

**692**

## *ORDER*

AND NOW, TO WIT, this 30th day of December, 1996, upon consideration of Defendants' Motion for Summary Judgment on Plaintiffs' Title VI Claim and Claims for Punitive Damages, and Plaintiffs' opposition thereto, IT IS ORDERED that said motion is GRANTED. Judgment is entered in favor of Defendants and against Plaintiffs on Count III of the Amended Complaint.

Upon consideration of Defendants' Motion for Summary Judgment on All or Part of the Claims of Plaintiffs Mills, Hodges, Valentine, Sewell, Burks and Young and to Strike the Claims of All Plaintiffs for Compensatory Damages, and Plaintiffs' opposition thereto, IT IS ORDERED that said motion is GRANTED IN PART AND DENIED IN PART, as stated in the accompanying Memorandum.