Engrid BULLOCK, Plaintiff,

v.

· The CHILDREN'S HOSPITAL OF
PHILADELPHIA, Defendant.

No. CIV. A. 98–2427.

United States District Court,
E.D. Pennsylvania.

Nov. 4, 1999.

Benson I. Goldberger, Philadelphia, PA,
for Plaintiff.

Gina M. Roccanova, Philadelphia, PA, for Defendant.

## *MEMORANDUM*

LOWELL A. REED, Jr., Senior District Judge.

Plaintiff Engrid Bullock ("Bullock") filed this lawsuit alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Const. Stat. Ann. § 955 et seq. and 42 U.S.C. § 1981. Specifically, Bullock alleges that she was terminated from her position with the Children's Hospital of Philadelphia as the Department Head Secretary for the Social Work Department because of her race, sex, age, ethnicity, and national origin.

Presently before the Court is the motion of defendant the Children's Hospital of Philadelphia ("the Hospital") for summary judgment (Document No. 17), the response and the reply thereto. Jurisdiction is proper pursuant to 28 U.S.C. § 1331. Because Bullock has failed to establish a prima facie case of discrimination, the motion will be granted.

## I. BACKGROUND[1]

Engrid Bullock is an African American woman who was born on November 24, 1945. Bullock was hired by the Hospital in 1990 as Department Head Secretary in the Home Care Department. In 1994, Bullock obtained the position of Department Head Secretary for the Social Work Department at the Hospital, were she worked until she was terminated on April 11, 1997.

In March of 1996, the Hospital hired William Tietjen as the new Director of the Social Work Department. Shortly after Tietjen arrived, he began reorganizing the social work department. At the time, there were three departmental secretaries, all of whom were African American. There was one Department Head Secretary, Bullock, as well as two Level II secretaries. Tietjen determined that two secretaries would be sufficient. Tietjen retained Bullock as the Department Head Secretary and consolidated the other two Level II secretary positions into one. The secretary whose position was eliminated was permitted to apply for and obtained a position in another department at the Hospital as a Department Head Secretary.[2]

Bullock received favorable evaluations prior to 1996. In 1994 and 1995, her performance rating was meets expectations (ME). (Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment ("Plt.Mem."), Exh. C.). Her performance rating for 1996 was expectations not achieved (ENA). (*Id.*).

In September of 1996, prior to her yearly evaluation, Tietjen issued an oral warning to Bullock (which was then memorialized in writing) that her job performance was unsatisfactory. (Defendant's Memorandum of Law in Support of Its Motion for Summary Judgement ("Def.Mem."), Exh. D). Tietjen evaluated Bullock's performance in December of 1996, rating her as having not met expectations. (*Id.*, Exh. E). The evaluation form breaks down performance into specific areas and attributes

---

1. The following summary is based on the evidence of record viewed in the light most favorable to Williams, the nonmoving party, as required when considering a motion for summary judgment. *See Carnegie Mellon Univ. v. Schwartz*, 105 F.3d 863, 865 (3d Cir.1997).

2. In addition to reorganizing the secretarial staff, Tietjen also reorganized the Social Work managerial staff. When Tietjen arrived there were four social work managers, three of whom were white and one of whom was African American. Tietjen apparently changed the manager position to a supervisor position. All four managers interviewed for a Social Work Supervisor position. The African American manager, Dolores Vorters, was hired as the Supervisor and the other three white managers were taken out of their manager positions and place into social work positions.

a percentage of time to each area. The evaluation reflects that Bullock did not meet expectations with respect to the two areas which are designated as accounting for forty percent of her time.[3]

Specifically, Bullock did not met expectations with respect to the first area listed under Job Specific Standards. The duties specified in the first category relate general secretarial duties such as typing and preparing correspondence. The written comment is: "inconsistent attention to quality of prepared work, often resulting in re-work. Specific improvement needed in the attention of detail on multi-step projects, accuracy in calculations, proofing for content and spelling and follow-through on projects." (Def.Mem., Exh. E). With respect to another category having to do with answering phones and providing information, Tietjen noted that there was a "variation in courtesy/tone easily detected when stressed or distracted." (*Id.*). Nevertheless, Bullock was rated as meeting expectations in this category. With respect to the category relating to performance of reception activities and assisting customers, Bullock was rated as not meeting expectations. The written comment is: "the interpersonal skill essential to this dept. head secretary position, especially under conditions of high volume, multiple requests and changing priorities, have not been demonstrated in a *consistent* and effective manner." (*Id.*). Finally, Bullock met expectations with respect to categories having to do with maintaining departmental accounts and acting as the timekeeper for the department. In her deposition, Bullock testified that she did not think that Tietjen was intentionally lying in his evaluation of her, but rather that she thought Tietjen believed she was not meeting expectations. (Def. Mem., Exh. A, at 106, 123–27).

As a result of her failure to meet expectations and consistent with Hospital policy, Tietjen and Dolores Vorters, the Social Work Department Supervisor, developed and implemented a Personal Improvement Plan (PIP). The PIP set forth specific areas in which Bullock was to improve. The PIP was initially scheduled to expire after sixty days on February 10, 1997. However, the PIP period was extended an extra thirty days because Bullock missed a number of days during the PIP period as a result of a death in her immediate family. Bullock testified that during the PIP period, she was under the impression that she was meeting expectations, although she kept doing things the same as always. (Plt. Mem., Exh. B, at 120–21). However, at the conclusion of the PIP period, Tietjen determined that Bullock had not performed satisfactorily.

Bullock was then given thirty days with which to apply for and secure a job elsewhere in the Hospital. Bullock was unable to secure other employment in the Hospital and was terminated on April 11, 1997. Bullock was replaced by Tracee Sigler, an African American woman who was born on August 27, 1970.[4]

## II. LEGAL STANDARD FOR SUMMARY JUDGMENT

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Under Federal Rule of Civil Procedure 56(c), summary judgment

---

3. Counsel for plaintiff appears to think it is significant that Tietjen rated Bullock's performance as meeting expectations in other areas, accounting for sixty percent of her time. However, in principal, there is nothing unreasonable about an employer implementing an improvement plan if an employee does not meet *all* job performance expectations. In any case, an employer can reasonably expect an employee to meet expectations more than sixty percent of the time.

4. Tracee Sigler was hired on June 30, 1997 and terminated on October 8, 1998 after not meeting performance expectations. Sigler also claims that she was fired because she was black. Sigler was replaced by an African–American woman named Jacqueline Anderson. (Def. Mem., Exh. B at 111).

may be granted when, "after considering the record evidence in the light most favorable to the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." *Turner v. Schering–Plough Corp.,* 901 F.2d 335, 340 (3d Cir. 1990). For a dispute to be "genuine," the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the non-moving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248–49, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party may not rely merely upon bare assertions, conclusory allegations, or suspicions. *Fireman's Ins. Co. of Newark v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982). A proper motion for summary judgment will not be defeated by merely colorable or insignificantly probative evidence. *See Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505.

## III. DISCUSSION

Bullock opposes the motion for summary judgement only with respect to her claims of racial discrimination under Title VII, 42 U.S.C. § 1981 and the PHRA. Indeed, "plaintiff consents to the dismissal of her other claims of discrimination." (Plt. Mem. at 1). Accordingly, I will only address Bullock's claims for racial discrimination.

Courts have uniformly interpreted the PHRA consistent with Title VII. *See Clark v. Commonwealth of Pennsylvania,* 885 F.Supp. 694, 714 (E.D.Pa.1995); *Violanti v. Emery Worldwide A–CF Co.,* 847 F.Supp. 1251, 1257 (M.D.Pa.1994). Similarly, courts have held that the legal standard for a § 1981 case is identical to the standard in a Title VII case. *See, e.g., Mason v. Ass'n for Indep. Growth,* 817 F.Supp. 550 (E.D.Pa.1993) (citing *Lewis v. Univ. of Pittsburgh,* 725 F.2d 910, 915 n. 5 (3d Cir.1983)). Thus, I will analyze Bullock's claim only under Title VII below; however, my analysis and conclusions are equally applicable to her claim of discrimination in violation of § 1981 and the PHRA. *Harris v. Smithkline Beecham,* 27 F.Supp.2d 569, 576 (E.D.Pa.1998) (applying same standard to Title VII, § 1981, PHRA and ADEA claims).

Bullock may sustain her claim by presenting direct evidence of racial discrimination or by using circumstantial evidence that would allow a reasonable factfinder to infer discrimination. *Starceski v. Westinghouse Elec. Corp.,* 54 F.3d 1089, 1095 n. 4 (3d Cir.1995); *see also, Price Waterhouse v. Hopkins,* 490 U.S. 228, 244–46, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (establishing a framework for mixed motive cases that involve direct evidence); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (establishing the framework for pretext cases that involve circumstantial evidence). Direct evidence is overt or explicit evidence which directly reflects discriminatory bias by a decision maker. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 778–79, 782 (3d Cir.1994) (analogizing direct evidence to the proverbial "smoking gun"). Indirect evidence is evidence of actions or statements from which one may reasonably infer discrimination. *Torre v. Casio, Inc.,* 42 F.3d 825, 829 (3d Cir.1994).

In order to proceed based upon direct evidence of discrimination, a plaintiff must present evidence that is "so revealing of discriminatory animus that it is not necessary to rely on any presumption from the prima facie case to shift the burden of production." *Armbruster,* 32 F.3d at 778; *see also Torre,* 42 F.3d at 829 (direct evidence is evidence that proves existence of discrimination without inference or presumption). In the face of direct evidence

of discrimination, both the burden of production and the risk of non-persuasion are shifted to the defendant who must show that even if the discrimination "was a motivating factor in the adverse employment decision, it would have made the same employment decision regardless of its discriminatory animus." *Armbruster*, 32 F.3d at 778; *see also Price Waterhouse*, 490 U.S. at 246, 109 S.Ct. 1775.

■ As direct evidence of discrimination, Bullock points to testimony from another former employee that Tietjen made disparaging remarks about people from the United Arab Emirates. Specifically, Tietjen was overhead to comment about someone from the United Arab Emirates that the person was ignorant because he ran up a credit card bill and that he should "speak American." (Plt. Mem., Exh. E at 153–54). In addition, Tietjen allegedly said "negative things" about people from the United Arab Emirates, thought they were difficult to deal with and talked about the fact that they were Muslim and had a different way of life. (*Id.* at 152–54).

■ As a general matter, comments, even by a decision-maker, will not constitute direct evidence of discrimination, unless they are related to the decisional process itself. *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight"), *cert. denied*, 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993); *Burks v. City of Philadelphia*, 950 F.Supp. 678, 686–87 (E.D.Pa.1996) (disparaging remarks about African–Americans generally not direct evidence of employment discrim-

ination). As Justice O'Connor stated in what is now her widely followed concurrence in *Price Waterhouse:*

> [s]tray remarks in the workplace, while perhaps probative of [a discriminatory animus], cannot justify requiring the employer to prove that its [employment] decisions were based on legitimate criteria. Nor can statements by nondecisionmakers, or statements by decisionmakers, unrelated to the decisional process itself, suffice to satisfy the plaintiff's burden in this regard.... What is required is ... direct evidence that decisionmakers place substantial negative reliance on an illegitimate criterion in reaching their decision.

490 U.S. at 277, 109 S.Ct. 1775. (O'Connor, J., concurring) (internal citations omitted); *Ezold*, 983 F.2d at 545. Accordingly, Bullock's reliance on what Tietjen allegedly said about someone from the United Arab Emirates as direct evidence of discrimination is misplaced. First, the comments do not relate to African–Americans generally or Bullock in particular. Bullock is not from the United Arab Emirates, she speaks English and has not claimed to be Muslim. Notably, there is no evidence of Tietjen making disparaging remarks about African–Americans. More importantly, the comments are not related to the decisional process itself, Bullock's employment or the employment of any other employee. Thus, the comments by Tietjen about someone from the United Arab Emirates do not indicate that Bullock was fired because of her race, nor do they prove, without reliance on inference or presumption, that race was the reason for Bullock's termination.[5] *Burks*, 950 F.Supp. at 688.

---

**5.** Bullock also asserts, as evidence of Tietjen's racism, that he did not speak to her and only socialized with white social workers. However, Tietjen apparently did not greet or engage in conversation with any of the secretaries. (Def. Mem., Exh. A, at 34–35). Moreover, anecdotal evidence about the people someone socializes with (or does not socialize with) is not "so revealing of discriminatory animus" to warrant the shifting of the burden of pro-

duction and persuasion. While race is undeniably one factor in determining who people socialize with, it is far from the only one and is not necessarily indicative of racial *animus*. Thus, such evidence cannot, without inference or presumption, prove that race was the reason for the decision to terminate Bullock and, therefore, is not direct evidence of discrimination.

Accordingly, they are not direct evidence of discrimination.

In the absence of direct evidence of discrimination, a plaintiff may proceed under the burden shifting paradigm of *McDonnell Douglas* and its progeny. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *McDonnell Douglas*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668; *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 643–44 (3d Cir.1998). To survive summary judgment, Bullock must first prove by a preponderance of the evidence that a prima facie case of unlawful discrimination exists. *Hicks*, 509 U.S. at 505, 113 S.Ct. 2742; *Marzano v. Computer Science Corp., Inc.*, 91 F.3d 497, 502–03 (3d Cir. 1996). This creates a presumption of discrimination. *Hicks*, 509 U.S. at 506, 113 S.Ct. 2742. Once a prima facie case has been established, the employer must produce some evidence of a legitimate nondiscriminatory business reason for the its action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir.1994). If this evidence is produced, Bullock may survive a motion for summary judgment if she "produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir.1996) (en banc); *Fuentes*, 32 F.3d at 764 (plaintiff can survive summary judgment by pointing to "some evidence, direct or circumstantial, from which a factfinder could reasonable either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action"). While the burden of production may shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

### A. Prima Facie Case

To establish a prima facie case, a plaintiff must introduce " 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion....' " *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 354 (3d Cir.1999) (quoting *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 312, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996) (internal quotations, brackets and emphasis omitted)). To establish a prima facie case of discriminatory discharge, a plaintiff must show that he or she: (1) is a member of a protected class; (2) was qualified for the position; and (3) was discharged under circumstances that give rise to an inference of unlawful discrimination. *Id.* at 357; *Waldron v. SL Indus., Inc.*, 56 F.3d 491, 494 (3d Cir.1995); *Brogan v. La Salle Univ.*, 1999 WL 895645, at *5 (E.D.Pa. Oct. 14, 1999). Common circumstances giving rise to an inference of unlawful discrimination include the hiring of someone not in the protected class as a replacement or the more favorable treatment of similarly situated colleagues outside of the relevant class.

In fact, it is common in discriminatory discharge cases for the last element of the prima facie case to be characterized as requiring that the plaintiff show that the position was filled by a person not of the protected class, *see Sheridan*, 100 F.3d at 1066 n.5, or that similarly situated nonprotected persons were treated more favorably, *see Josey v. John R. Hollingsworth Corp.*, 996 F.2d 632, 638 (3d Cir. 1993). Although a plaintiff may make out a prima facie case with such evidence, as the Court of Appeals recently clarified, however, neither of these is *required. Pivirotto*, 191 F.3d 344, 356-57. In *Pivirotto*, the Court of Appeals held that, in order to make out a prima facie case, a plaintiff claiming discriminatory firing need not prove that she was replaced by someone outside of the relevant class. Rather, relying on Supreme Court precedent, the

Court of Appeals explained that the prima facie case "clearly require[s] only 'evidence adequate to create an inference that an employment decision was based on an illegal discriminatory criterion'" and is not limited to showing that the position was filled by a person not of the protected class or even that other similarly situated employees outside of the relevant class were treated more favorably. *Id.* at 355, 357–59 (quoting *O'Connor*, 517 U.S. at 312, 116 S.Ct. 1307) (omitting internal quotation, brackets and emphasis).[6]

Specifically, in *Pivirotto*, the Court of Appeals for the Third Circuit held that a woman did not have to show that her employer hired a man to replace her in order to make out her prima facie case of sex discrimination. The Court of Appeals reasoned that the fact that someone in a protected class claiming discrimination was replaced by another person from the same class might have some evidentiary force, "[b]ut this fact does not, as a matter of law or logic, foreclose the plaintiff from proving that the employer was motivated by her gender (or other protected characteristic) when it discharged her." *Id.* at 353.

The Court of Appeals explained that the major purpose of the prima facie case is to "eliminate the most obvious lawful reasons for the defendant's actions (i.e., the position that an applicant sought was not filled for economic reasons, the applicant was not qualified, no adverse action such as failure to hire or firing was actually taken, etc.)." *Id.* at 350. The Court reasoned that requiring a plaintiff to prove she was

replaced by someone outside of her class does not eliminate a common lawful reason for the discharge. For instance, if a plaintiff cannot prove that she was qualified or that the employer took an adverse employment action against her, it is clear why the claim of discrimination should fail. In contrast, the inability to prove that the plaintiff was replaced by someone outside of his or her class is not necessarily inconsistent with demonstrating that the employer treated him or her "less favorably than others because of [his or her] race, color, religion, sex or national origin." *Pivirotto*, 191 F.3d at 352. Thus, the Court of Appeals reasoned that "[e]ven if the plaintiff was replaced by someone within her own class, this simply demonstrates that the employer is willing to hire people from this class . . . and does not establish that the employer did not fire the plaintiff on the basis of her protected status." *Id.* In so doing, the Court of Appeals also noted that some employers, anticipating litigation, may attempt to hire someone from the same class in an attempt to defeat a claim of discrimination.

The Court of Appeals also found guidance in Supreme Court precedent, explaining that the reasoning of the Supreme Court in *O'Connor*, which rejected the notion that an age discrimination plaintiff must prove, as part of the prima facie case, that he or she was replaced by someone outside the protected class, "applies equally in the gender or race context: 'The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant [to the prima facie

**6.** The Hospital argues that to make out a prima facie case in a "straight termination case," Bullock must prove that she was replaced by some one outside of her class and that a "more favorable treatment of similarly-situated employees" analysis is only appropriate in reduction-in-force cases. In *Pivirotto*, the defendant made essentially the same argument, asserting that the only exception to the requirement that the plaintiff prove that she was replaced by someone outside of her class in order to make out a prima facie case is in a reduction-in-force case in which no one re-

places the plaintiff. 191 F.3d 344, 350. The Court of Appeals rejected this argument, holding that plaintiff need only produce evidence sufficient to raise the inference of discrimination. *Id.* at 356–57. Because evidence showing that other similarly situated employees outside of the plaintiff's class were treated more favorably may raise the inference of discrimination, it follows that such evidence is sufficient to establish a prima facie case of discrimination in a straight termination case as well as in a reduction-in-force case. *See id.*

case].'" *Id.* at 354 (quoting *O'Connor,* 517 U.S. at 312, 116 S.Ct. 1307). Thus, the Court of Appeals held that "it is inconsistent with Title VII to require a plaintiff to prove that she was replaced by someone outside of her class in order to make out a prima facie case." *Id.* at 355.

The Court of Appeals also noted that it had previously held that a plaintiff could make out a prima facie case without demonstrating that employees outside of the relevant class were treated more favorably, let alone that the plaintiff was replaced by someone outside of the relevant class. *Pivirotto,* 191 F.3d 344, 357 (citing *Matczak v. Frankford Candy & Chocolate Co.,* 136 F.3d 933, 939 (3d Cir.1997)). Thus, although it acknowledged some "imprecision" in language that the Court of Appeals has used in the past with respect to the "fourth prong" of the prima facie case, the Court of Appeals explained that it was consistent with Third Circuit precedent and Supreme Court precedent that a plaintiff can meet his or her prima facie burden by demonstrating generally that he or she was either not hired or fired under circumstances that give rise to an inference of unlawful discrimination. *Id.*

The Hospital, which filed its motion prior to the *Pivirotto* decision, argues that Bullock failed to establish a prima facie case because she was replaced by Tracee Sigler who is also African–American (as opposed to someone outside of Bullock's class). Although this fact does not support an inference of discrimination, it also does not preclude Bullock from presenting other evidence from which an inference of discrimination can be drawn, establishing

her prima facie case. In sum, the fact that Bullock was replaced by someone within her own class is not dispositive and does not preclude Bullock, as a matter of law, from establishing the existence of a prima facie case.

■ Bullock argues that she has introduced evidence that Tietjen treated Caucasian employees more favorably than African–American employees, thereby making out a prima facie case.[7] Specifically, Bullock argues that Tietjen treated white social workers more favorably than African–American social workers.[8] This does not, however, establish a prima facie case of discrimination by the Hospital against Bullock.

"To be deemed 'similarly situated' the individuals with whom a plaintiff seeks to be compared must 'have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Dill v. Runyon,* 1997 WL 164275, at*4 (E.D.Pa. April 3, 1997) (citing *Anderson v. Haverford College,* 868 F.Supp. 741, 745 (E.D.Pa.1994); *Watkins v. The Children's Hosp. of Philadelphia,* 1997 WL 793518, at *2 (E.D.Pa. Dec. 3, 1997)). In *Watkins,* the plaintiff, an African–American Nurse's Aid, sought to compare herself to the treatment of white Registered Nurses. The plaintiff argued that because there were no white Nurse's Aids the only comparison that could be drawn was to white Registered Nurses. Nevertheless, the district court granted summary judgment because, notwithstanding the lack of a suitable compa-

---

**7.** It is uncontested that Bullock is a member of a protected class, that she was qualified for the position she held and that she was subject to an adverse employment decision.

**8.** In her deposition, Sigler testified that an African–American social worker was written up for taking too many sick days but that two other white social workers "were out sick all the time and called in late and pretty much did what they wanted to do." (Plt Mem., Exh. E ("Sigler Dep.") at 25). Another Afri-

can–American social worker's travel request to attend a conference in new Orleans where she was to be a presenter was denied. In addition, she had been required to get two signatures for the request. In contrast, according to Sigler, Tietjen simply "signed off" on a white social worker's request to attend a conference in California. (*Id.* at 39–41). Finally, according to Sigler, Tietjen "wrote up" an African–American social worker without a full investigation. (*Id.* at 50).

rator, a Registered Nurse is not similarly-situated to a Nurse's Aid. The court reasoned that "differentiating or mitigating circumstances" between the two groups justified differential treatment. Likewise, Bullock is not similarly situated to the group with whom she seeks to draw a comparison. Moreover, she does not argue that white social workers were treated more favorably with respect meeting to performance expectations. *Dill*, 1997 WL 164275, at*4 (employees who were not terminated for cause were not similarly situated to plaintiff who was terminated for cause).

Just as a comparison between the plaintiff and differently situated employees does not establish a prima facie case of discrimination against a plaintiff, a comparison among non-similarly-situated employees does not establish that an employer has discriminated against the plaintiff. *Stove v. Philadelphia Sch. Dist.*, 58 F.Supp.2d 598, 603 n.4 (E.D.Pa.1999) (evidence that white supervisor was treated more favorably than African–American supervisor cannot satisfy janitor's prima facie case of discrimination). Bullock cannot satisfy her burden of establishing a prima facie case of discrimination *against her* by comparing the treatment of a non-similarly-situated employee within her class with the treatment of a non-similarly-situated employee outside of her class. The nexus required to invoke the presumption that a plaintiff was discriminated against is that the plaintiff was subjected to less favorable treatment, not simply that someone else in her class was treated less favorably. Thus, Bullock's assertion that Tietjen treated white social workers more favorably than African–American social workers does not establish a prima facie case of discrimination against Bullock.

This, however, does not end the inquiry. Despite the judiciary's penchant for clearly delineated standards which serve as a dispositive check list, race discrimination claims require that the Court consider the unique nature of the circumstances and evidence presented to determine whether there is sufficient evidence to support an inference of discrimination. *See, e.g., McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817 (noting the facts necessary to establish a prima facie case will vary in Title VII cases); *Matczak*, 136 F.3d at 938 ("we cannot enumerate every possible element of a prima facie case due to the factual vagaries that distinguish all cases."). Thus, a plaintiff is not limited to evidence that the plaintiff's replacement was not a class member or that other similarly situated employees outside of the relevant class were treated more favorably in order to make out a prima facie case. *Pivirotto*, 191 F.3d at 355-57. Nevertheless, the plaintiff must prove by a preponderance of the evidence that a prima facie case of discrimination exists. It does not suffice to suggest the mere possibility of discrimination.

Here, Bullock fails to present evidence that she was terminated under circumstances giving rise to an inference of discrimination. Bullock testified that she believed that Tietjen discriminated against her because of her race because she could not figure out any other reason that he would have criticized her job performance. (Def. Mem., Exh. A at 33–34). To make out a prima facie case of discrimination requires more than such speculation. Bullock's disagreement with Tietjen's assessment of her job performance is not sufficient to raise a presumption of discrimination. Furthermore, Bullock's assertion that the performance deficiencies noted by Tietjen were due to the fact that the other secretary, Eldora Hatton (who is also African–American), was having performance problems is not evidence that Tietjen's criticisms were motivated by racial animus. Although Bullock feels that her termination was unfair and is at a loss to explain why Tietjen faulted her performance, Bullock has failed to establish by a preponderance of the evidence the exis-

tence of a prima facie case of discrimination.

## IV. CONCLUSION

For the foregoing reasons, the motion will be granted.