**Stanley Bomani CRUMPTON, Plaintiff**

v.

**John E. POTTER, Defendant**

**No. 02–CV–8536.**

United States District Court, E.D. Pennsylvania.

Feb. 25, 2004.

Stanley Bomani Crumpton, Pro se, for Plaintiff or Petitioner.

Richard M. Bernstein, Defendant or Respondent.

## MEMORANDUM AND ORDER

ANITA B. BRODY, District Judge.

Plaintiff Stanley B. Crumpton ("Crumpton") brings this employment discrimination action against defendant John E. Potter, Postmaster General of the United States Postal Service ("Postal Service"), alleging that the Postal Service engaged in discrimination on the basis of race when he was disciplined for leaving mail unattended overnight on the post office platform. In addition, Crumpton alleges that he was subject to unlawful retaliation for having filed administrative complaints of discrimination [1] and harassment.[2]

Crumpton's *pro se* complaint, liberally construed, asserts the following three causes of action: (1) race discrimination in

---

1. Crumpton filed numerous complaints in the years 1997, 1998, 2000, and 2001.

2. In his complaint, Crumpton also states a claim of "character assassination." Because Crumpton does not expound upon this claim, nor cite an applicable statute or cause of action, I decline to address this claim.

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e[3]; (2) retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a); (3) harassment in violation of Title VII of the Civil Rights Act of 1964.[4]

Presently before this court is defendant's motion for summary judgment on all counts. For the reasons that follow, defendant's motion is granted.

## A. Background[5]

Plaintiff Stanley Crumpton ("Crumpton"), an African American male, has been employed as a mail carrier for the United States Post Office for seventeen years. (Crumpton Dep. at 8.) During all times relevant to this action, Crumpton was employed at the Schuykill Station, located at 2900 Grays Ferry Avenue, Philadelphia, Pennsylvania. (*Id.*) On June 19, 2001, an unknown number of parcels were left on the outside platform of the Grays Ferry Avenue Schuykill Station in an "all-purpose container," or APC. (Def.' Mot. Summ. J. at 3; White Dep. at 9.) By the time the unattended parcels were discovered on the morning of June 20, 2001, the parcels had been vandalized.

Shortly after the parcels were discovered on the morning of June 20, 2001, Supervisor Rachel White ("White") identified the unattended parcels as belonging to Crumpton's mail route. (White Dep. at 13.) When Crumpton arrived for work on June 20, he was informed that he had left mail parcels on the platform. (Crumpton Dep. at 12.) Crumpton admits that he is responsible for ensuring that his mail is not left on the platform (*Id.* at 14.) It is, however, also the responsibility of the closing supervisor to ensure that no mail has been left on the platform at closing time.[6]

**3.** Although Crumpton's complaint includes a claim for sex discrimination, this claim was not part of plaintiff's EEO discrimination complaint. Because a plaintiff must exhaust all applicable administrative remedies before filing suit in federal court under Title VII, this court does not have jurisdiction to address Crumpton's claim of sex discrimination. *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir.1984). Additionally, although Crumpton stated a claim for discrimination on the basis of disability in his complaint, and defendant moved for summary judgment on this claim, Crumpton has failed to bring forward any evidence in support of this claim in his response to defendant's motion. In fact, Crumpton has failed to even mention a disability discrimination claim in his response. I will not, therefore, address the merits of his disability discrimination claim.

**4.** Crumpton, proceeding *pro se*, does not explicitly reference this statute in his complaint. Rather, Crumpton summarily states that he was "discriminated based on race, retaliation, disability, character assassination, harassment, disparity of treatment, and sex." (Compl.¶ 2.) Defendant's motion for summary judgment construed the complaint as asserting claims under Title VII. In Crumpton's *pro se* response to the motion, Crumpton does not contest the application of Title VII to the allegations of his complaint and implicitly agrees that this is the appropriate statute, as he makes his arguments with reference to Title VII. Accordingly, this court construes Crumpton's complaint as asserting claims under Title VII. Crumpton also cites 42 U.S.C. § 1981, but, because Title VII is the sole remedy for federal employees alleging employment discrimination claims, I decline to address Crumpton's claims under 42 U.S.C. § 1981. *Waiters v. Parsons*, 729 F.2d 233, 236 n. 7 (3d Cir.1984).

**5.** Because defendant moves for summary judgment, the facts are set forth in the light most favorable to plaintiff. *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997).

**6.** Although there is some disagreement among deponents regarding whether or not it was the closing supervisor's responsibility to check the platform for unattended parcels, defendant admits that the closing supervisor's "duties would have included making sure that the loading dock had no mail left on it at closing time." (Answer ¶ 2.) Therefore, I will assume for purposes of this motion that in addition to Crumpton's responsibility to check

Bridget Bohannan ("Bohannan"), a white female, was the closing supervisor on duty the night of June 19, 2001. According to Ashe, Bohannan was still in training as a closing supervisor on June 19, 2001. (Ashe Dep. At 18–19.) Although Crumpton avers that Bohannan was no longer in training at the time of the platform incident, he offers no support for this assertion. (Pl.'s Resp. to Def.'s Mot. Summ. J. at 5.)

According to Crumpton, after he was confronted with the fact that he had left parcels on the platform, the Station Manager, Dan Ashe ("Ashe"), told Crumpton to go back to work. (*Id.* at 13–14.) Crumpton had begun loading his truck when he was approached by both Ashe and White and told to accompany them to a meeting in the office. (*Id.* at 14.) At the meeting Ashe told Crumpton that as a result of his leaving mail on the platform, the "agency" had taken the position that Crumpton should be placed "off the clock" for forty-five days. (*Id.* at 15.) To be taken "off the clock" is to be suspended without pay. (*Id.*) According to Crumpton, the "agency" refers to Area Manager Dennis Carr ("Carr").

According to Crumpton, he told Carr, Ashe, and White that he believed that he rolled the parcels inside the building on the night of June 19, 2001.[7] (*Id.* at 13.) Crumpton does not state when or where he communicated this belief to these people. At some point on June 20, 2001, however, Crumpton signed the following statement:

> the platform for his parcels, it was also the closing supervisor's responsibility to check the platform for unattended parcels. (Crumpton Dep. at 14.)

7. Whether or not Crumpton admitted or denied having forgotten to roll his parcels inside is an issue in dispute. According to Ashe, Crumpton did not state that he believed that he rolled the parcels inside the building.

On June 19th, 2001 at approx [sic] 5:15 pm I[,] S.B. Crumpton [,] returned to Schuylkill Post Office from parcel delivery. I backed my vehicle to the loading dock unloaded approx [sic] 8 parcels into APC [all-purpose container] and then proceeded to park and se[c]ure my vehicle for the day. The temperature was hot and humid and I was a bit exhausted from the heat and unintentionally left my notified parcels in the APC on the loading dock.

(Def.'s Mot. Summ. J. Ex.4.) Crumpton has since recanted this confession. In his June 2003 deposition, Crumpton claims that while he was "shocked" and "confused" when he was first told that he had left his parcels outside, he now knows that he rolled them inside. (Crumpton Dep. at 13.)

Beginning on June 20, 2001, Crumpton was suspended for forty-five days as result of this incident [hereinafter "platform incident"]. In contrast, Bohannan received a verbal reprimand from Ashe but was not placed "off the clock." (Ashe Dep. at 18.) According to Ashe, because Bohannan was still in training as a night supervisor on the night of June 19, 2001, she was disciplined more leniently than a supervisor in similar circumstances normally would have been. (*Id.* at 18–19.) On July 27, 2001, Crumpton requested pre-complaint counseling with an EEO counselor. Crumpton returned to work on August 3, 2001. (Crumpton Dep. at 28.) On August 20,

(Ashe Dep. at 28.) According to Carr, plaintiff admitted leaving the parcels on the platform. (Carr Dep. at 11.) Crumpton's shop steward Anthony Johnson ("Johnson"), however, stated that he recalled hearing Crumpton tell White and Ashe that he believed he rolled the parcels in the building. (Johnson Dep. at 7.)

2001 he filed a formal EEO complaint regarding the platform incident.

Because Crumpton's retaliation and harassment claims involve several subsequent incidents, I will discuss the facts applicable to each incident in chronological order.

### A. Threatened Suspension on August 20, 2001

According to Crumpton, on August 20, 2001, less than one month after he filed an EEO complaint regarding the platform incident, Ashe asked Crumpton to come to his office. (*Id.* at 29.) Crumpton was accompanied by his shop steward, Anthony Johnson ("Johnson"). (*Id.*) Crumpton alleges that during the meeting Ashe stated that because Crumpton filed a grievance concerning the platform incident, Ashe was going to see if he could put Crumpton "off the clock" again. (*Id.*) Crumpton admits, however, that although he felt threatened and harassed by this statement, he was not subsequently "put off the clock." (*Id.* at 30.)

### B. Request for Temporary Schedule Change on August 28, 2001

On August 28, 2001, Crumpton requested a temporary schedule change from Supervisor Kevin Mahoner ("Mahoner"). (Crumpton Dep. at 31.) As supervisor, Mahoner had the responsibility of approving or disapproving temporary schedule changes. (Mahoner Dep. at 1.) According to Crumpton, Mahoner told Crumpton that he could change his schedule if postal

worker Rose Townsend would agree to "switch" with him. (Pl.'s Resp. to Def.'s Mot. Summ. J. at 6.) Subsequent to Crumpton's conversation with Mahoner, Ashe instructed Mahoner to rescind that offer. (*Id.;* Mahoner Dep. at 19.) Crumpton alleges that Ashe's order rescinding Mahoner's previous offer was an instance of retaliation for Crumpton's having filed an EEO complaint regarding the platform incident.[8]

### C. Citation for Absence Without Leave on September 6, 2001

According to Crumpton, he was out on sick leave due to stress from August 31, 2001 until September 6, 2001. To excuse his absence, Crumpton presented documentation from his doctor justifying his absence for forty hours, or five days of work. (Crumpton Dep. at 45.) Rather than approve Crumpton's absence for the entire forty hours, however, management at the Schuylkill Station, specifically Ashe and Mahoner, approved only thirty-two hours, or four days, of Crumpton's absence. (*Id.*) Crumpton, therefore, was given an AWOL (Absent Without Leave) charge for the fifth day he was absent. (*Id.* at 47.) According to Crumpton, it was unprecedented for management to decide to approve only a portion of the time documented by a doctor. (*Id.* at 46.) Likewise, Crumpton alleges that this discriminatory treatment was in retaliation for his filing an EEO complaint on July 27, 2001.

In response, Crumpton filed a grievance with his union challenging the AWOL

---

**8.** Lending support to Crumpton's allegation, Mahoner stated that, except for this particular instance, he could not recall Ashe ever reversing a supervisor's decision on a temporary schedule change. (Mahoner Dep. at 19.) Furthermore, Johnson stated that it was unusual for a station manager to override the decision of a supervisor on an issue of this sort. (Johnson Dep. at 12.) Ashe, however, stated that he disapproved the schedule change because Crumpton wanted to switch with a utility worker who was not on his same route, and that allowing such a switch might result in either the office needing to pay overtime to a worker, or having two people on one shift for the same job. (Ashe Dep. at 35–36.)

charge. As result of the grievance procedure, Crumpton was retroactively granted the additional 8 hours of sick leave, the AWOL charge was removed, and Crumpton was given back-pay. (*Id.* at 48–49.)

### D. Other Incidents of Alleged Harassment and Retaliation

Crumpton identified two remaining incidents of alleged harassment and retaliation. First, on September 19, 2001, parcels were again found on the platform. (Crumpton Dep. at 59.) Subsequent to that discovery, Crumpton claims that Mahoner and Ashe accused him of leaving the parcels on the platform. (*Id.*) Although Crumpton claims that the accusation constituted harassment and discrimination, Crumpton was not disciplined for the September 19 incident. (*Id.* at 60).

Second, on November 7, 2002, Mahoner denied Crumpton's request for overtime. (Crumpton Dep. at 66.) Again, Crumpton alleges that the denial of overtime was a result of retaliation. According to Crumpton, he has filed an EEO complaint based on this incident, but, as of June 17, 2003, the Postal Service had not yet issued a final decision. (*Id.* at 67.)

### B. Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56(c), "[s]ummary judgment should be granted if, after drawing all reasonable inferences from the underlying facts in the light most favorable to the non-moving party, the court concludes that there is no genuine issue of material fact to be resolved at trial and the moving party is entitled to judgment as a matter of law." *Kornegay v. Cottingham*, 120 F.3d 392, 395 (3d Cir.1997). Stated differently, "[t]he inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Moreover, when the nonmoving party bears the burden of proof, it must "make a showing sufficient to establish the existence of [every] element essential to that party's case." *Equimark Commercial Fin. Co. v. C.I.T. Fin. Servs. Corp.*, 812 F.2d 141, 144 (3d. Cir.1987) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). If a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

### C. Discussion

Defendant moves for summary judgment on all of plaintiff's claims. I will begin by discussing plaintiff's claim of discrimination on the basis of race. Thereafter, I will address plaintiff's claims of retaliation and harassment.

#### 1. Discrimination on the Basis of Race

Plaintiff alleges discrimination on the basis of race in violation of Title VII. Title VII makes it unlawful for an employer to discriminate against any individual with respect to compensation or terms, conditions, or privileges of employment on the basis of race. 42 U.S.C. § 2000e–2(a).

The legal framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is applicable to the analysis of a claim of discrimination on the basis of race. Under the burden shifting framework of *McDonnell Douglas*, plaintiff has the initial burden of establishing a prima facie case of employment discrimination. *Mar-*

zano v. Computer Science Corp., 91 F.3d 497, 502–03 (3d Cir.1996). Therefore, in order to survive summary judgment, the plaintiff must first prove by a preponderance of the evidence that a prima facie case of discrimination exists.[9] *See Reeves v. Sanderson Plumbing Prods. Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000); *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir.2000). If the plaintiff fails to establish a prima facie case, summary judgment in favor of defendant is proper.

Discrimination can be shown under either of two theories, disparate impact theory or disparate treatment theory. "A disparate impact violation is made out when an employer is shown to have used a specific employment practice, neutral on its face but causing a substantial adverse impact on a protected group, and which cannot be justified as serving a legitimate business goal of the employer." *Equal Employment Opportunity Comm'n v. Metal Serv. Co.*, 892 F.2d 341, 346 (3d Cir. 1990). Under a disparate impact analysis, a plaintiff need not show intentional discrimination in order to prevail. *Id.* at 346–47. In contrast to a disparate impact violation, a disparate treatment violation "is made out when an individual of a protected group is shown to have been singled out and treated less favorably than others similarly situated on the basis of an impermissible criterion." *Id.* at 347. To proceed under a disparate treatment theory, plaintiff must prove that the employer had a discriminatory motive. *Id.* Since Crump-

ton's complaint included "disparity of treatment" as an allegation, I will construe the complaint as alleging violations under the disparate treatment analysis. (Compl.¶ 2.)

■ Under a disparate treatment analysis, to establish a prima facie case of race discrimination, a plaintiff must show that (1) he is a member of a protected class; (2) he was qualified for the position; (3) he was discharged from or denied the position, or suffered adverse employment consequences; and (4) non-members of the protected class were treated more favorably. *Harris v. SmithKline Beecham*, 27 F.Supp.2d 569, 578 (E.D.Pa.1998), *aff'd*, 203 F.3d 816 (3d Cir.1999) (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817).

The defendant asserts that he is entitled to summary judgment because Crumpton has failed to establish the fourth element of a prima facie case of race discrimination. For the reasons expressed below, I agree.

To satisfy the fourth element of his prima facie case of discrimination, the plaintiff must establish that similarly situated non-protected persons were treated more favorably than he. To be deemed "similarly situated," the plaintiff must show "that the other employee's acts were of 'comparable seriousness' to his own infraction." *Anderson v. Haverford College*, 868 F.Supp. 741 (E.D.Pa.1994) (quoting *Lanear v. Safeway Grocery*, 843 F.2d 298,

---

9. Under the now familiar *McDonnell Douglas* analysis, once the plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant successfully carries this burden, then, in order to survive summary judgment, the plaintiff must produce sufficient evidence to raise a genuine issue of

fact as to whether the defendant's proffered explanation is pretextual. *Bullock v. Children's Hospital of Philadelphia*, 71 F.Supp.2d 482, 487 (E.D.Pa.1999) (citing, *inter alia*, *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066 (3d Cir.1996) (en banc)). Because I find that Crumpton fails to establish a prima facie case, my analysis does not reach the burden shifting phase.

301 (8th Cir.1988)). In other words, the individual with whom the plaintiff seeks to be compared must have "engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Anderson,* 868 F.Supp. at 735, 868 F.Supp. 733 (quoting *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir.1992)); *see also Bullock,* 71 F.Supp.2d at 489; *Dill v. Runyon,* No. CIV.A.96–3584, 1997 WL 164275, at *4, 1997 U.S. Dist. LEXIS 4355, at *12 (E.D.Pa. Apr.3, 1997); *Watkins v. The Children's Hosp. of Phila.,* No. CIV.A97–1510, 1997 WL 793518, at *2, 1997 U.S. Dist. LEXIS 19268, at *5–6 (E.D.Pa. Dec.3, 1997).

In support of his discrimination claim, Crumpton seeks to compare himself, an African American mail carrier, with Bohannan, a white closing supervisor. Bohannan was the night supervisor on duty the night of June 19, 2001. As a mail carrier, Crumpton described his job duties as delivering mail to customers and retrieving mail from mailboxes in order to bring those items to the "hub station" for processing and delivery. To accomplish these duties, Crumpton spends eight of his eight and one-half hour workday driving a postal vehicle. (Crumpton Dep. at 9.) In contrast, Bohannan described her responsibilities as a closing supervisor as "mak[ing] sure the building is secured, and all the collection mail gets on the truck." (Bohannan Dep. at 7.) As previously noted, I will assume for purposes of this motion that it was also Bohannan's responsibility as closing supervisor to check the platform for unattended parcels.

As a result of the platform incident, it is undisputed that Crumpton was placed "off the clock" for forty-five days. In contrast, Bohannan only received a verbal reprimand. (Ashe Dep. at 18.) According to

Ashe, Bohannan was disciplined more leniently than a supervisor typically would have been because she was still in training as a closing supervisor on the night of June 19, 2001. (*Id.* at 18–19.) Although Crumpton avers that Bohannan was no longer in training at the time of the platform incident, he offers no support for this assertion. (Pl.'s Resp. to Def.'s Mot. Summ. J. at 5.)

■ At this stage of the *McDonnell Douglas* analysis, the burden rests solely on Crumpton to establish his prima facie case. Although "this Court has not been overly demanding in the proof required for a prima facie case," more is demanded of a plaintiff than Crumpton attempts to establish on his prima facie case. *Whack v. Peabody, & Wind Eng'g Co.,* 595 F.2d 190, 194 n. 11 (3d Cir.1979). Crumpton, as a mail carrier, was responsible for ensuring that none of his parcels were left on the platform. On the other hand, as closing supervisor, Bohannan had the responsibility of checking the platform at closing in order to make sure that nothing had been left in the area. Although the comparative seriousness of Crumpton and Bohannan's conduct is arguably similar—after all, both Crumpton and Bohannan's oversight resulted in unattended mail being left outside of the post office overnight—Crumpton has failed to establish that both Crumpton and Bohannan were subject to the same workplace standards.

While Crumpton was a seasoned mail carrier of approximately fifteen years at the time of the platform incident, Crumpton has presented no evidence to contradict the testimony of Ashe that Bohannan was still in training as a closing supervisor on the night of June 19, 2001. (Ashe Dep. at 21–22.) Without any specific supportive facts in the record, the plaintiff's bald assertions alone cannot overcome the defendants' motion for summary judgment. *See*

*Harvey v. City of Philadelphia,* 253 F.Supp.2d 827, 831 (E.D.Pa.2003) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co., Inc.,* 998 F.2d 1224, 1230 (3d Cir.1993)). In sum, the post office's treatment of Bohannan cannot shed light on the issue of whether the Postal Service discriminated against Crumpton because there are differentiating and mitigating circumstances that significantly distinguish both their conduct and their employer's treatment of them. Because plaintiff has not identified any similarly situated non-protected person who was treated more favorably than he, he has failed to make out a prima facie case of race discrimination. Accordingly, I enter summary judgment in favor of defendant on this claim.

### 2. Retaliation

Prior to filing the EEO complaint regarding the platform incident on October 10, 2001, Crumpton had filed numerous previous complaints in 1997, 1998, 2000, and 2001. Crumpton contends that the Postal Service engaged in various instances of retaliation in response to his EEO complaints. Specifically, Crumpton alleges· that the following incidents, described in detail *infra,* constituted reprisal in response to his filing an EEO complaint: (1) Crumpton's forty-five day suspension after the platform incident; (2) the threatened suspension on August 20, 2001; (3) the denial of Crumpton's request for a temporary schedule change on August 28, 2001; (4) Crumpton's AWOL citation on September 6, 2001; (5) Ashe and Mahoner's accusation on ·September 19, 2001; and (6) Mahoner's denial of Crumpton's request for overtime on November 7, 2002. Crumpton's claims for retaliation are brought pursuant to 42 U.S.C. § 2000e–3(a).

Section 2000e–3(a) provides, in relevant part:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, plaintiff must establish that: (1) he engaged in activity protected by Title VII; (2) the employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. *Nelson v. Upsala College,* ·51 F.3d 383, 386 (3d Cir.1995). Once a plaintiff establishes a prima facie case, the burden of production shifts to the defendant to advance a legitimate, nonretaliatory reason for the adverse action. *Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989). "If the employer comes forward with evidence showing some legitimate non-retaliatory reason, the employee still has the opportunity to produce evidence sufficient to persuade the factfinder by a preponderance of the evidence that the employer nevertheless harbored a discriminatory intent." *Delli Santi v. CNA Ins. Companies,* 88 F.3d 192, 199 (3d Cir. 1996). In other words, the plaintiff must then show that the defendant's proffered reason is pretextual. Defendant contends that Crumpton has failed to establish a prima facie case of retaliation with respect to any of the incidents outlined above.

For purposes of analysis, I will first discuss Crumpton's allegations of retaliation with respect to the incidents outlined above as (2), (3), (4), and (5). Assuming,

*arguendo*, that Crumpton has set forth sufficient proof at this stage to satisfy the first and third elements of a retaliation claim with respect to these incidents, Crumpton's claims nonetheless cannot survive because the alleged retaliatory conduct of which Crumpton complains fails to rise to the level of an "adverse employment action."

The Third Circuit has held that "the 'adverse employment action' element of a retaliation plaintiff's prima facie case incorporates the ... requirement that the retaliatory conduct rise to the level of a violation of 42 U.S.C. § 2000e–2(a)(1) or (2)." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300–01 (3d Cir.1997). Therefore, other than discharge or refusal to rehire, "[r]etaliatory conduct ... is [ ] proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" Robinson, 120 F.3d at 1300 (quoting 42 U.S.C. § 2000e–2(a)).

■ According to Crumpton himself, two of the alleged retaliatory incidents—the August 20, 2001 threatened suspension by Ashe, outlined above as claim (2), and the accusation of September 19, 2001, outlined above as claim (5)—did not result in any tangible adverse consequences to Crumpton. Because these alleged incidents were not "serious and tangible enough to alter [Crumpton's] compensation, terms, conditions, or privileges of employment," he has failed to make out a prima facie case of retaliation based on these events. *Robinson*, 120 F.3d at 1300 (holding that "unsubstantiated oral reprimands" and "unnecessary derogatory comments" do not rise to the level of an adverse employment action). Similarly, with respect to the AWOL incident, outlined

above as claim (4), Crumpton did not suffer an adverse employment action because he was retroactively granted the additional 8 hours of sick leave, the AWOL charge was removed, and he was given back-pay. (Crumpton Dep. at 48–49.) With respect to the denial of Crumpton's request for a temporary schedule change on August 28, 2001, outlined above as claim (3), I again find that the Postal Service's refusal to authorize Crumpton's request fails to rise to the severity of an adverse employment action.

■ Additionally, I find that Crumpton's retaliation claim concerning his denial of overtime on November 7, 2002, outlined above as retaliation claim (6), is not properly before me. In general, before a federal employee may file suit in federal court under Title VII, he must exhaust all applicable administrative remedies by filing a charge of discrimination with the EEOC. *Waiters*, 729 F.2d at 237. The limits of the federal court action are "defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir.1996). However, the Third Circuit has recognized that, in certain circumstances, a plaintiff will be excused from exhausting administrative remedies with respect to a claim. Specifically, in *Waiters*, the Third Circuit held that "[t]he relevant test in determining whether appellant was required to exhaust her administrative remedies ... is whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." If the plaintiff has a pending EEOC complaint and the new act(s) are fairly within the scope of the EEOC complaint, "the purposes of the statutory scheme are not furthered by requiring the victim to file additional EEOC complaints," and, therefore, the plaintiff

does not need to exhaust administrative remedies with respect to the new claim. *Id.* In this case, however, the Final Agency Decision of the Office of EEO Compliance and Appeals was filed on November 1, 2002. Because Crumpton's denial of overtime occurred on November 7, 2002, it could not have been within the scope of the agency's investigation. Crumpton, therefore, has not exhausted his administrative remedies with respect to this alleged retaliatory incident and I decline to address its merits.

■  Finally, with respect to Crumpton's claim that his forty-five day suspension after the platform incident constituted an act of retaliation, outlined above as retaliation claim (1), I find that this claim also fails to survive defendant's motion for summary judgment. Assuming, *arguendo*, that Crumpton has set forth sufficient proof to satisfy the first two elements of the retaliation claim, this claim nonetheless fails because Crumpton has made no showing that the third element, that is, that there was a causal connection between his participation in the protected activity and the adverse employment action, is satisfied.

Case law in this Circuit has elaborated various ways in which a plaintiff can demonstrate the causal link necessary to establish a prima facie case of retaliation. A causal link "may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Madden v. Runyon*, 899 F.Supp. 217, 222 (E.D.Pa.1995). However, a causal link can exist even if a significant amount of time has elapsed between the protected conduct and the adverse employment action. *Id.; see Robinson v. Southeastern Pa. Transp. Auth.*, 982 F.2d 892, 894–95 (3d Cir.1993) ("The mere passage of time is not legally conclusive proof against re-

taliation."). In the absence of temporal proximity between the protected conduct and alleged retaliation, "a plaintiff may still make out the causal link by producing circumstantial evidence of a pattern of antagonism following the protected activity." *Alderfer v. Nibco, Inc.*, No.CIV.A.98–6654, 1999 WL 956375, at *5, 1999 U.S. Dist. LEXIS 16083, at *14 (E.D.Pa. Oct.19, 1999) (mem.) (citing *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir.1997)). The Third Circuit has cautioned, however, that "[a]lthough timing and ongoing antagonism have often been the basis for the causal link, our case law clearly has allowed a plaintiff to substantiate a causal connection for the purpose of a prima facie case through other types of circumstantial evidence that support the inference." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280–81 (3d Cir.2000). Cautioning against too restrictive a view of the type of evidence that can be considered probative of the causal link, the Third Circuit in *Farrell* noted the court's willingness "to explore the record in search of evidence" in light of the fact that "our caselaw has set forth no limits on what we have been willing to consider." *Farrell*, 206 F.3d at 281.

Crumpton's most recent EEO complaint prior to the platform incident was filed on February 16, 2000, approximately sixteen months before June 19, 2001. *See Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir.1997) (finding a nineteen month interlude between protected activity and alleged retaliation, without other evidence, insufficient as a matter of law to support an inference of causation). In addition to the lack of temporal proximity, a thorough search of the record has revealed no evidence to support an inference of a causal connection between Crumpton's prior protected activity and his forty-five day suspension as a result of the platform inci-

dent. In fact, besides complaining that he was punished more severely than the closing supervisor on duty, Crumpton does not allege that a forty-five day suspension is an atypical punishment for a mail carrier who leaves mail unattended on the platform overnight. In sum, Crumpton has not met his burden of establishing the causation element of a prima facie case of retaliation.

■ Furthermore, even if Crumpton could establish a prima facie case of retaliation, Crumpton's failure to ensure that his mail was not left on the platform is a legitimate, non-retaliatory reason for the Postal Service's decision to suspend Crumpton for forty-five days. To rebut a defendant's proffered nonretaliatory reason at the summary judgment stage, a plaintiff must submit evidence that a) casts sufficient doubt upon the defendant's proffered reason so that a factfinder could reasonably conclude that the reason was a fabrication, or b) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action. *Fuentes v. Perskie*, 32 F.3d 759, 762–65 (3d Cir.1994).

■ Crumpton has failed to rebut the defendant's nonretaliatory reason for suspending him because he has failed to raise a material issue of fact with respect to either of these two grounds. First, Crumpton has not cast sufficient doubt upon the defendant's proffered reason to allow a factfinder to conclude that the reason was a fabrication. Because the factual dispute at issue is whether the employer was motivated by discriminatory animus, the plaintiff "cannot simply show that the employer's decision was wrong or mistaken ... [but] must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

... [such] that a reasonable factfinder *could* rationally find them unworthy of credence." *Fuentes*, 32 F.3d at 765 (internal citations omitted). Crumpton has brought forth no such evidence. Second, Crumpton has failed to bring forth evidence that would allow a reasonable factfinder to infer that discrimination was more likely than not a motivating or determinative cause of his suspension. Such evidence could include demonstrating that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer discriminated against other members of his protected class or other protected categories of persons. *Fuentes*, 32 F.3d at 765 (listing examples of evidence that would allow a plaintiff to rebut a defendant's proffered nonretaliatory reason at the summary judgment stage). For these reasons, summary judgment will be granted to defendant on all of Crumpton's retaliation claims.

### 3. Harassment

Although Crumpton's response to defendant's motion for summary judgment is somewhat unclear, it appears that Crumpton's claim of harassment concerns the same incidents that are the subject of his claims for retaliation.

Hostile work environment harassment is actionable under Title VII and occurs when "the conduct in question [is] severe and pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile—and an environment the victim-employee subjectively perceives as abusive or hostile." *Weston v. Pennsylvania*, 251 F.3d 420, 426 (3d Cir. 2001) (internal citations omitted). I am guided by the following factors in deter-

mining whether Crumpton has stated such a claim: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; whether it unreasonably interferes with an employee's work performance." *Id.* "While it is possible for a single action to constitute a claim for hostile work environment harassment if the act is 'of such a nature and occurs in such circumstances that it may reasonably be said to characterize the atmosphere in which a plaintiff must work,' generally a plaintiff must show that she was subjected to 'repeated if not persistent acts of harassment.'" *McCutchen v. Sunoco, Inc. et al.*, No. CIV.A.01–2788, 2002 WL 1896586, at *4, 2002 U.S. Dist. LEXIS 15426, at *12–13 (E.D.Pa. Aug. 16, 2002) (quoting *Bedford v. Southeastern Pa. Transp. Auth.*, 867 F.Supp. 288, 297 (E.D.Pa.1994)).

I find, as a matter of law, that the incidents alleged by Crumpton do not constitute the requisite severe or pervasive conditions necessary to constitute a claim and conclude that Crumpton has failed to allege harassment that rises to the level of a hostile work environment. Thus, summary judgment will be granted to defendant on this claim as well.

### *ORDER*

AND NOW, this 25th day of February 2004, it is **ORDERED** that defendant's motion for summary judgment is **GRANTED** and this case is **DISMISSED WITH PREJUDICE**. Judgment is entered in favor of defendant and against plaintiff.